All right, we call the next case, Glenn v. BP. Okay, Mr. Freo, when you're ready, sir. May it please the Court, Mark Freo for Robert Glenn. With me today at the Council table is Keith Ketterling. In several key places in its opinion, the District Court sharply deviated from the clearly articulated form-nonconvenience standards. It applied the wrong legal standards, ignored and made incorrect factual findings, and it failed to hold BP to its burden of proof. In balancing form-nonconvenience and making its ultimate conclusions, it acted unreasonably and abused its discretion. Mr. Freo, keep your voice up a little bit. I'm a little hard of hearing. Thank you, Your Honor. Upholding the District Court's decision in this case will erode the rights of U.S. citizens to seek redress for injuries suffered at home at the hands of foreign corporations. It will also unsettle well-established law in this area. Given the time I have this morning, I'd like to focus on the public interest factors, in particular the foreign law factor, the local interest factor, the jury burden factor, and if I have time, the court congestion factor. The foreign law factor was the only public interest factor that the District Court found weighed strongly in favor of dismissal. The problem with the District Court's finding and the reason it was an abuse of discretion, it was based on the District Court's opinion that Mr. Glenn's claims were weak as a matter of English law. At the same time that BP filed its motion to dismiss for form-nonconvenience, it also filed a motion to dismiss under Rule 12b-6 for failure to state a claim. In connection with that motion, the parties briefed the substantive English legal issue regarding whether the dividends that were declared by the Board of Directors in April of 2010 were cancelable at any time. The District Court didn't decide the Rule 12b-6 motion. It reserved it because it dismissed on the basis of form-nonconvenience. But in its opinion in the section dealing with foreign law, the Court acknowledged that it had taken a preliminary review of the merits of Mr. Glenn's claims and that it found the weight of English authority was against him. Let me ask you this. I read your reply very carefully, and I didn't see where you cite any controlling of English authority that's in your favor. I didn't see a case or a statute or anything that's from English law that is controlling that would say that English law favors you. Sure. Thank you, Your Honor. That's a good question. Our position is that the Court, and there's clear Second Circuit authority to support the proposition that in deciding a motion for form-nonconvenience, the District Court is not to look at the merits of the plaintiff's claims. But wasn't the judge clear about the limited purpose of the examination on the merits, not to decide the merits, but merely to look at whether the law was well-developed or not, which is an appropriate factor to consider, or to look at, and to look at whether the argument that your client was presenting would require an extension or new application of the law, and if so, whether that is more appropriately done by the forum court as opposed to an American court? Absolutely. What is your best case for your argument that that goes beyond what a District Court can do in a form-nonconvenience analysis? Well, both the Manu case from the Second Circuit and the more recent decision of Alnwick. The problem is the Court's only legal basis for delving into the merits of Mr. Glenn's claims was the Gilstrap case, which is dubious authority given the very clear statements by the Second Circuit that in connection with a form-nonconvenience motion, a District Court is not to look at the merits of the plaintiff's claims. And Gilstrap, in turn, relied on an earlier case from the Second Circuit, the Conte case, which actually had decided and applied Argentinian law in that case. The court in Dicta mentioned that it was reluctant to get into the merits of foreign law issues in cases where there wasn't clear guidance as to what the foreign law was. That case, of course, was decided before the adoption of FRCP 44.1, which gives courts clear permission and flexibility to determine foreign law questions. But he didn't determine the foreign law, as Judge Rosenthal said. He expressly said he was looking to see how well developed it was to determine whether he should endeavor to decide the issue or whether it would be better for an English court to decide it. I understand. And that was actually — that's a key distinction between this case and the derivative case, because Judge Elson actually found that the case law was well developed on the issues in this case. It was in stark contrast to the derivative case where you had — That's right. But he also found that it wasn't — that the proposition you were advancing to prevail would require an extension, and that that kind of extension of well-developed law was something that a foreign court ought to be asked to decide, as opposed to an American court construing it without the added credibility of the foreign court. Well, we disagree with the court's position that this would have required an extension of foreign law. I understand that, but is — my question is a slightly different one. Is that an undue intrusion into the merits for the purpose of foreign nonconvenience analysis? It absolutely is, because it really opens the door every time you have a foreign nonconvenience motion for a district court to examine the merits and the substance of the claims, which is not the purpose of the foreign nonconvenience doctrine. The purpose of the foreign nonconvenience doctrine is to figure out which court essentially is the most convenient court for the action to take place. It's not to decide whether we think that the claim under foreign law is weak or not. The district court was perfectly comfortable delving into these English legal questions. The cases that are cited by both parties date back 100 years, and the parties are generally in agreement as to what law is applicable. The only question is what the result is in this case. And we argued to the district court that the parties are not in disagreement that boards of directors under English law can be given the power to declare final dividends that are not cancelable after they're declared, based on the nonstandard provision 131B of the Articles of Association. There is the treatises themselves that have been cited by both parties provide that directors can be given the power to declare dividends. We've cited—there's a case from the Australian High Court, and the Australian court—of all the Commonwealth countries, the Australian courts are the most persuasive to English courts. There is precedent that we have cited. We have competing expert declarations. Our expert, Mr. Mabb, was very clear that this was a viable theory and that— Again, I didn't see an English case that was cited that you said was controlling. There is not an English case that is on all fours with this one. But for every principle that we've cited, there is authority to support our proposition. Mabb's declaration in particular, which is in the record, is very thorough and goes through many of the authorities that were cited, both by BP and other authorities, pointing out the fact that this nonstandard provision, that a lot of those cases that were cited by BP are dealing with cases in which the directors were not given the power to declare dividends. You're dealing here with a section that the only—the Section 131B could only have meaning if it means something other than what Article 132 says, which has to do with the payment of interim dividends. Some cases are highly factual, and some cases kind of depend on how the law turns. Now, what are the factual issues, if any, in this case? Well, the factual issues generally will involve—well, there's two sort of levels here, and this was another problem because the other error the Court made in connection with the foreign law factor is it refused to take due consideration of the fact that New York law applies. And so there's two levels of—I'm sorry, Judge Larzenfeld. At some point, I want you to answer what the relevant differences are between New York law and other law here. Okay. Thank you. So the English legal issue in the case has to do with the cancelability of the dividends that were declared by the Board of Directors in April of 2010. The New York legal issues obviously have to do with the other elements and— The elements of the common law. for money hadn't received on just enrichment and breach of contract. So those are the—and Judge Ellison didn't take due consideration of the fact that any court that will hear this case will have to apply both New York law and English law. Is the New York choice of law clause part of the record? It is part of the record. It's in the depository agreement, and the depository agreement is really the agreement that it gives rise to the relationship between the ADS holders and BP. Well, do you agree that the English law question is a threshold question? It is an important question if Mr. Glenn does not— You've got to start there before you get out of the gate, don't you? Well, right, because if we don't survive that, the case is over. So clearly that's a critical issue, and we're not pretending that it's not a critical issue in the case. And the factual issues surrounding the English law question have to do with the nature of the Board meetings that took place, draft minutes, final minutes, any meetings, any discussions that occurred around April 2010, both when the Board of Directors referred the question to the Results Committee, the Results Committee's declaration of the dividend, and discussions surrounding the cancellation later in June. I mean, apparently there's no—I'll ask you. Is there any doubt that the dividend was declared and then rescinded? Well, Your Honor, there's no dispute about the fact that— I mean, the documents are what they are. There is a dispute about the significance of the events that took place. BP's position is that there was no declaration of a final dividend by the Board of Directors, that it was simply an announcement of an interim dividend that could be cancelable at any time by the Board of Directors, and that the cancellation subsequently happened in June, five days before the date for payment. And we have a disagreement about whether that was in fact cancelable for multiple reasons, both for the reason that it was a final dividend that was declared and became a debt as soon as it was declared, and also because of the record date provision that's also in the Articles of Association, Article 140—I believe it's Article 143—that provides a record date, and when the record date is announced, that is the date that the shareholder shall be entitled to the dividend, that it's a New York Stock Exchange-related provision that makes those dividends uncancelable. And does that issue turn on English law? That's an interesting question, because I think that it intersects with U.S. law because of the fact that it is an exchange-related provision that is nonstandard. Our position is that 131B is also a nonstandard provision that is more related to what they were doing in the United States in trading their securities on the New York Stock Exchange. The district court also erred in addition to applying the foreign law factor to find that the local interest factor also weighed in favor of dismissal. It appears that the district court only weighed this factor slightly in favor of dismissal. The court's language was, well, to the extent it weighs either way, it weighs in favor of dismissal. In our view, that indicates that it was only slightly weighed in favor of dismissal. But even that was error. Fundamentally, the issue that the court erred on was its focus on the need for an interest to be relevant for purposes of the local interest factor to be unique, and there's no authority for that proposition. In fact, the Boston Telecom case, the Ninth Circuit was faced with that question. It said, no, it does not have to be unique. And the DiRienzo case addressed that issue indirectly. That was a case involving a claim for securities fraud against a Canadian company whose stock was listed on both Canadian exchanges and U.S. exchanges. The court nonetheless, sitting in the United States, found that the local interest factor weighed in favor of retaining jurisdiction, even though obviously the interest of both the Canadian forum with respect to securities purchased on the Canadian exchanges would be identical to the interest of U.S. shareholders. So the focus and the requirement that the interest be unique was an abuse of discretion. Well, didn't the court look at the interest of other corporations in England on the outcome of this corporate law issue? Well, and Judge Davis, I believe that the court was focused on the fact that, in the court's view and BP's argument, was that this was a matter of internal corporate affairs. It is not just a matter of internal corporate affairs, and even Koster and Piper stand for the proposition that even a question involving internal affairs is simply one of many factors, and it's not even definitive of inconvenience. It may indicate inconvenience, but it's certainly not determinative of the question. Moreover, this case is not just about the internal affairs of a corporation. Well, this whole issue is just a balancing of all these factors, isn't it? And the district court has enormous discretion in balancing all this out. The district court does have discretion. I understand this is an uphill battle. It's an abuse of discretion standard, but the private interest factors did not weigh strongly in favor of dismissal, and the court erred in finding that the public interest factors weighed strongly in favor of dismissal. It made critical errors in applying the wrong standards. Why wouldn't the interest on English law, which seems to be so central to this case, why wouldn't that be a strong balance in favor of the English forum? It is a factor in favor of an English forum, but you cannot look at that in a vacuum. You have to look at the fact that the entire class here is composed of ADS holders who predominantly are in the United States. That is undisputed. The district court didn't look at it in a vacuum. He considered all of those other factors as well, did he not? He mentioned them in his opinion. The problem is that he didn't give it the weight that it has to be given because the case law is clear that when you have interests in two jurisdictions, they balance each other out, they cancel each other out. It should have been neutral. The interest in this case is about, if I may finish. Sure. This case is about entirely ADS shareholders who purchased their stock through the New York Stock Exchange pursuant to BP's efforts over the last 40 to 50 years to inject itself into the U.S. capital markets to gain access to U.S. shareholders. Okay. We have some time left for rebuttal. Thank you, sir. Okay. Mr. Peppermint. Good morning. May it please the Court. Rick Peppermint on behalf of the Appalachee BP PLC. I want to start by emphasizing that there can be no question that Judge Ellison applied the correct forum nonconvenience framework as set forth in the precedence of both this Court and of the Supreme Court. He correctly determined that there is no dispute in this case that England is an available and adequate alternative forum for this litigation. He analyzed the discretion that should be assigned to the plaintiff's choice of forum and determined that the plaintiff's choice of forum here is, in fact, entitled to discretion. And then Judge Ellison considered and balanced each of the relevant private and public interest factors going through each of them individually. Under this Court's precedent, the Court below, having applied the correct framework, the judge's decision to dismiss the case on forum nonconvenience grounds is assessed under a clear abuse of discretion standard. And I understand that the plaintiff disagrees with Judge Ellison's application of many of the relevant factors. He said this morning that he disagrees with the weight that Judge Ellison gave to certain factors. But again, under this Court's precedent, that is not enough. Neither the plaintiff nor the appellant court reviewing the decision below can substitute its judgment for that of the district court in going through the relevant private and public interest factors. As was clear this morning, the plaintiff's principal argument is that the Court below assigned too much weight to the need to apply English law in this case. I must emphasize at the outset that Judge Ellison, in managing this MDL proceeding, has not shown a reluctance or hesitancy to tackle questions of English law. The largest number of cases pending before him as part of this MDL are cases brought by individual shareholders who purchased their shares of BP PLC on the London Stock Exchange and are asserting fraud claims under English common law. These shareholders are made up not only of US shareholders, but actually the predominance of them are foreign shareholders who purchased their shares on the London Stock Exchange. Judge Ellison denied the defendant's motions for forum nonconvenience dismissal in those cases, notwithstanding the need to apply foreign law. So obviously the trial judge here is both willing to tackle questions of English law and understands that the need to apply English law is not in and of itself dispositive of the forum nonconvenience question. So the plaintiff really makes two arguments. The plaintiff's first argument on the foreign law factor is that Judge Ellison in effect dismissed the case because he believed that the plaintiff's claims were meritless under English law. And the plaintiff cites for that proposition the Second Circuit's decision in the Manu case. But I would submit that this is not a case where the trial judge substituted a forum nonconvenience motion in effect for a summary judgment motion. I think the court below did exactly what Judge Rosenthal said, which was he analyzed the English law issue. He determined that the plaintiff's argument under English law, which is based on a nonstandard provision in BP's article association and does not fall within the existing English case law, was an effort to extend existing English law into a different area and determined that if a court were to do that, it should be an English court, not him. And that dismissing the case on foreign nonconvenience grounds would free him from the need to disentangle what would be difficult English law questions. And then the second argument that the plaintiffs made is that there are parts of his case that are governed by New York law. And with respect to that, Judge Ellison expressed skepticism that that is in fact the case. And our argument, obviously, is that it is not, that New York law will not apply to any of the claims here. The plaintiffs point to the choice of law provision in the deposit agreement, but the plaintiff's claims here do not arise under the deposit agreement. And really, the deposit agreement itself is not relevant to the plaintiff's claims. And we went through and briefed this for this court in connection with the derivative litigation. And I'll refer, for example, to the Ninth Circuit's decision, I think in Batchelder, where in dealing with derivative litigations and foreign nonconvenience motions, courts have applied the internal affairs choice of law rule and have not looked to the choice of law provision in the deposit agreements that give rise to the ADSs, just frankly because the claims there do not arise under the deposit agreements. And then the second part of the plaintiff's argument is that his common law claims here, his underlying claims for relief, would be governed by New York law. I mean, he's in effect proposing a dichotomy, which is the board's ability to cancel the dividend is governed by English law, but then somehow his underlying claims for relief would be governed by New York law. And that's not the case. If we got to the point where we were analyzing the elements of the underlying claims, the claims for unjust enrichment, something, money had received, contract, the court would apply governing choice of law rules, which I submit in this instance would point towards English law to govern the common law claims. So again, I think that Judge Ellison's skepticism of the need to apply New York law to any part of this case was well placed. And then the last item that I want to address, and then of course I'll answer any questions the court has, is obvious, I mean, one of the themes you heard from the plaintiffs this morning was that Judge Ellison improperly strayed into the merits, and that he should have applied the public and private interest factors without any consideration of the merits whatsoever. And if you go through those factors, it really is impossible for a trial judge to apply the factors in a vacuum with blinders on to what are the merits of the underlying claim. Many of the factors require a trial judge to give at least preliminary consideration to what will be at issue in the merits. I mean, for example, the factors having to deal with the location of evidence, the availability of compulsory process to compel unwilling witnesses, the cost of obtaining witnesses' testimony at trial, all of those require a trial judge to give a preliminary consideration of the merits, determine what is the evidence at issue, who are the likely witnesses,  What's your best case where a judge has looked this deeply into the governing law on, say, a threshold question? Well, Your Honor, I was actually worried you were going to ask me that question because the reality is when you go through these cases, these forum non-convenience cases, is they're so incredibly fact-bound that it is very difficult to find a case that is exactly on point, which is why I was prepared to answer if you were to ask me what was my best case overall to say that it's the body of the Fifth Circuit precedent that sets forth what the standard of review are here. But I think that the best two cases on this point are the one, the Gilstrap case, which is, I believe, the case that Judge Ellison cited. It's not a court of appeals decision. It's a 2006 Southern District of New York decision. And in that case, the trial judge, in looking at the need to apply foreign law, considered that the plaintiff's argument was, I believe, an effort to extend foreign law so that it would not be a straightforward application of it. And really, I think, Your Honor, although it's different, Judge Ellison's decision and this court's decision affirming his dismissal of the derivative litigation is very analogous. In that case, the issue of standing to sue was governed by a new English statute, the Companies Act of 2006, where there was not yet a lot of existing English precedent on standing to sue. And so Judge Ellison's view was they should go back to the courts of England to enable them to develop this precedent. This is really not all that different. The plaintiff's argument is that the board of directors, instead of issuing an interim dividend pursuant to Article 132, issued some other kind of dividend pursuant to Article 131B. Article 131B, which has existed in BP's Articles of Incorporation, I think, since 2003, is a nonstandard provision. It does not exist in any of the model articles of incorporation that exist in England. So there is no English case law directly on point applying an article such as Article 131B. So if Judge Ellison were to confront that, he would be wading into an area, again, where there's no English law directly on point. Our argument, obviously, if this case were to proceed on the merits, was that this was an interim dividend that the board resolved to pay pursuant to Article 132, and therefore that would fall within the heartland of existing English law, and the board would have the ability to cancel it before it was paid. But I honestly think that Judge Ellison was giving the plaintiffs the benefit of the doubt and saying if you want to advance this novel argument under a nonstandard provision of BP's Articles of Incorporation, then that's really an argument that you should be addressing to the English courts that can reason through it from first principles. And live with the consequences. And live with the consequences. Because, you know, although the class here is defined as ADS holders, any decision on the propriety of the board's cancellation of the dividend would apply to all shareholders, more than 60% of which live in countries outside the United States. And it would result, really, in an important milestone of English law that all English public liability companies would need to deal with. Because the operating assumption, as I understand it among English lawyers today, is that whether or not a previously announced dividend can be canceled turns on the body that resolved to pay it. And if it was the shareholders at the annual general meeting who voted to pay a dividend, then obviously the directors subsequently can't countermand a decision reached by the shareholders, who are the ultimate governing body of the corporation. But if the directors resolve to pay a dividend, then in the exercise of their business judgment between the time of that announcement and when the dividend is paid, they can reconsider that decision if they determine if it's in the best interest of the corporation not to pay the dividend. And a decision to break from that dichotomy, that the ability to cancel the dividend turns on who resolved to pay it, if a court is going to break from that and create, in effect, a new rule for all English corporations, again, I think Judge Ellison believed that that's a decision that should be made by the English high court and subject to appellate review in England rather than Judge Ellison sitting in Houston. So unless the court has any questions, thank you very much. Okay, thank you, sir. Okay, Mr. Friel, back to you, sir. Thank you. Judge Davis, I'd like to start by you had asked previously for a citation to an English case. I would refer the court not only to the expert declarations in this case but also the briefing at the trial court. In particular, this is 1420466.661 to 662, which is part of the plaintiff's opposition brief on the motion to dismiss at the trial court level. And we cite from a case of the England's highest court, Inland Revenue Commissioners v. Laird Group, PLC, and I'm just going to quote from the decision here. It says, In the early days, Articles of Association commonly left the declaration of dividends to the company in general meeting, that is to say the shareholders themselves. Gradually, however, it became the general practice to require the dividend to be declared by the directors. The change was a response to the increasing separation of ownership and management. The shareholders own the company, but they entrust the management of its undertaking to the directors. To enable the directors to carry out their functions, shareholders give them a discretion to decide how much of the company's funds should be retained to pay creditors and carry on the business and how much can safely be returned to the shareholders by way of dividend. By declaring a dividend, the directors effectively release funds due to the shareholders from their power to retain them in the business. You didn't cite that case to us? That was not cited in the appellate briefing, correct? But I'm quoting from the briefing below. This is in the record. I'd just briefly like to address a couple of points. First of all, this is not the derivative case, and that's a concern, a particularly acute concern, because when the Fifth Circuit in its unpublished decision affirmed the dismissal on foreign money convenience grounds of the derivative action, it made some important findings as to why the court did not abuse its discretion, one of which was you were dealing with an unsettled issue of English law, a newly enacted U.K. statute, and parties that couldn't agree on the standards that would apply. Here, that's clearly different. There's much authority from which to draw, as the district court acknowledged. You're also dealing with a situation where you have plaintiffs, an entire competitive class, that are composed primarily of Americans, of U.S. citizens, which was different than the derivative case where BP was the plaintiff in that case, and any damages awarded in that case would have gone to BP. Here, the damages were suffered by predominantly Americans, and any recovery would go to them. With respect to the standard review, I have to say- But opposing counsel said 60% were foreign investors. So 60% of all of the shareholders of BP. The case in front of you now is composed solely of ADS shareholders, so shareholders who purchased their stock on the New York Stock Exchange, and it's undisputed that most of those shareholders are American. But a decision would affect all the other shareholders, too. It probably would. There really wasn't any briefing below about whether a judgment in a U.S. court on this issue would be effective, but the court could make that assumption, although it wasn't anything that was briefed below. The other thing that wasn't briefed below, and this is an issue that opposing counsel had raised in his argument here today, is that English law would apply to the common law claims in this case. That was not argued below. It was not briefed below. It was not considered by the court, and it was not a basis for the district court's decision. Well, I think he said that because you said New York law would apply. That's correct, and we contended that below, and we contended that in our briefing, but that's not inconsistent with our position that we took below. That was something that we did argue. It was never countered? It was never countered in the way that it was countered today. We agree that in the balancing of the factors, you can't take this in a vacuum, but the problem is that there isn't a case that a defendant has cited for the proposition that a court can look at the merits of a plaintiff's claims like the district court did in this case. The cases that they cited in their briefs and the description that you heard today deals with simply the facts that a court has to find relating to the claims in order to figure out, in other words, what sorts of facts do we need to discover? Where do we need to go to get witnesses? Those sorts of things. It's not, is this a good claim? Is it a bad claim? Is it a weak claim? Is it a strong claim? That went too far, and that was an abuse of discretion. And I would also like to say that the court didn't actually balance the factors in this case the way it should have. We've got a problem of inputs here, and the court is entitled to and can and has the authority to look at those inputs and determine if what was input into this decision was correct, if the court made correct findings of fact and applied the correct legal standards. Thank you. Thank you very much. Thank you, counsel. We have your case.